## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 26 2018, 5:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew Bernlohr
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeremiah Walker, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | July 26, 2018 <br><br> Court of Appeals Cause No. 49A05-1712-CR-2901 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Mark D. Stoner, Judge <br><br> Trial Court Cause No. 49G06-1606-MR-21462 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jeremiah Walker (Walker), appeals his conviction and sentence for felony murder, Ind. Code § 35-42-1-1(2); and carrying a handgun without a license, a Class A misdemeanor, I.C. § 35-47-2-1.

We affirm.

# ISSUES

Walker presents two issues on appeal, which we restate as:

(1) Whether the State committed prosecutorial misconduct during closing argument; and

(2) Whether Walker's sentence is inappropriate in light of the nature of the offenses and his character.

# FACTS AND PROCEDURAL HISTORY

In 2016, Erbie Thompson (Thompson) and his fiancée Holly Bartlett (Bartlett) resided together on the east side of Indianapolis, Indiana. Thompson was a drug dealer, and Walker and his girlfriend, Jessica Figueiredo (Figueiredo), and Solomon Keets (Keets), were his customers.

On May 31, 2016, Walker, Figueirodo, and Keets drove to Thompson's home to purchase "spice," a "form of synthetic marijuana." (Tr. Vol. II, p. 88). Figueiredo was left inside the vehicle while Walker and Keets went inside to buy drugs. When they returned to the vehicle, Walker was upset because the twenty-dollars' worth of spice, also known as "twenty sack," was "short again."

(Tr. Vol. III, p. 26). At that point, Walker and Keets "started talking about robbing" Thompson of his drugs and money. (Tr. Vol. III, p. 26).

[6] Figueiredo, who later agreed to participate in the robbery, recommended buying zip ties instead of using Walker's "flimsy" ropes to secure any occupants at Thompson's house. (Tr. Vol. III, p. 30). Based on Figueiredo's suggestion, the trio next drove to the Menards store located on Shadeland Avenue. The surveillance videos captured Walker and Figueiredo purchasing the zip ties. Later that afternoon, they all drove back to Thompson's house to execute the robbery. Because there was a vehicle in the driveway, they drove by a couple of times until the vehicle was gone. After parking their car in the back of the house, Walker accessed Thompson's house by pushing the door which was already "cracked open." (Tr. Vol. III, p. 33). Keets and Figueiredo followed Walker inside. First, they went into a bedroom and found Bartlett, Thompson's fiancée, lying in bed. Walker pointed his gun at Bartlett and ordered her to "shut up." (Tr. Vol. III, p. 34). Keets explored the house and found another occupant, Philip Lewis (Lewis), sleeping in another bedroom. Keets pointed a "silver revolver" at Lewis and instructed him to remain "where [he] was." (Tr. Vol. III, p. 89). Walker encountered Thompson in the hallway, and a "scuffle" ensued. (Tr. Vol. III, p. 123).

[7] Moments after the scuffle with Thompson, Walker returned to the bedroom and ordered Figueiredo tie up Bartlett with a zip tie. Walker offered Figueiredo his gun, but because Figueiredo was busy tying up Bartlett, Walker placed the gun on the nightstand. After securing Bartlett, Figueiredo reached for the gun,

but it was missing. While looking for the missing gun, Figueiredo also asked Bartlett to point to where the money and drugs had been hidden. Shortly thereafter, Walker came back into the bedroom and questioned Figueiredo if she had located the money and drugs. When Figueiredo stated that she was unsuccessful, Walker became upset. Figueiredo also informed Walker that she could not locate the gun on the nightstand, but Walker expressed that it was in his possession.

[8] Bartlett, who was zip-tied and on the bed, started "being loud and making a lot of noise." (Tr. Vol. III, p. 35). Walker walked over to Bartlett and "grabbed her and he spun her around on the bed." (Tr. Vol. III, p. 35). While pointing his gun at Bartlett, Walker ordered Bartlett to direct him to where the drugs and money were hidden. Because Bartlett was not cooperating, Figueiredo approached Bartlett and "punched her in the face," and stated, "just tell him where the stuff is because he's not playing." (Tr. Vol. III, p. 37). Bartlett pointed to the dresser drawer, Figueiredo conducted a search, but there were no drugs or money. Figueiredo then heard somebody inside the house say that the police were being contacted. Based on the announcement, Keets ran out of the house. Figueiredo wanted to leave, but Walker ordered her to keep looking for the money and drugs.

[9] While still armed with a gun, Walker grabbed Bartlett by the hair and dragged her outside. Thompson ran outside armed with a pool cue stick to rescue Bartlett. Because Thompson appeared as if he was about to hit Walker, Figueiredo picked up the dresser drawer and threw it at Thompson, hitting his

head and neck. Thompson stubbled, and as he attempted to swing the pool cue stick at Walker, Walker fired his gun twice. One of the bullets struck Thompson in his left hip, causing him to fall. At that moment, Walker, Figueiredo, and Keets, who was hiding by the garage, ran to the car and drove off. Bartlett managed to get the license plate number and the police were then contacted.

[10] After the police had ensured the area was safe, the medic put Thompson in an ambulance and transported him to the hospital. The bullet that struck Thompson's hip travelled into his abdominal cavity where it perforated his colon, intestines, and femoral artery, causing Thompson to suffer severe internal bleeding. Medical intervention was unable to stop the bleeding, and Thompson died as a result.

[11] Meanwhile at Thompson's house, the responding police officer ran the license plate number of the vehicle and determined that it was registered to Figueiredo. A broken cue stick that had spots of blood on it was found outside, and a zip tie was located inside the bedroom. The police later located Figueiredo's vehicle. A Menards receipt for the zip ties was found inside the car. Walker's and Keets' fingerprints were found in several areas of the vehicle. Bartlett and Lewis both identified Walker as the shooter in a photo array. Also, Bartlett identified Figueiredo in a photo array.

[12] On June 6, 2016, the State filed an Information, charging Walker with Count I, murder, a felony; Count II, felony murder; Count III, attempted robbery, a

Level 3 felony; Count IV, carrying a handgun without a license, a Level 5 felony; and Count V, criminal confinement, a Level 3 felony. A bifurcated jury trial was conducted on October 31, 2017, and November 2, 2017. At the close of the evidence, the jury was hung on the murder charge, but found Walker guilty of all other charges. The State subsequently dismissed the murder charge. At his sentencing hearing on November 17, 2017, the trial court merged the Level 3 felonies—attempted robbery and criminal confinement charges—into the felony murder verdict. The trial court then sentenced Walker to sixty-three years for the felony murder conviction, and a one-year consecutive sentence for carrying a handgun without a license offense, for an aggregate sentence of sixty-four years to be served in the Department of Correction.

[13] Walker now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Prosecutorial Misconduct*

[14] During closing argument, the State began discussing the evidence used to prove each of Walker's offenses. While explaining the evidence pertaining to the Level 3 felony criminal confinement charge, the State argued, in part, that

> You are going to get an instruction on accomplice liability, so
> keep that in mind as I go through each of these offenses. What
> the instructions are essentially going to tell you is when you are
> in it, you're in it. If you are all working together, you are on the
> hook for every offense that occurs. He is certainly guilty of
> confining . . . Bartlett, by pointing a gun and holding her there. It

doesn't matter that [Figueiredo] was the one that zip tied, he's just as guilty.

(Tr. Vol. III, pp. 122-23). In his appellate brief, Walker now argues that the State's argument was

> a blatant misstatement of the law. Based on the complex nature of accomplice liability, and the fact the jury seemingly relied on this form of liability to form its verdict, this misstatement of law impacted the jury's ability to judge the evidence fairly and placed Walker in grave peril.

(Appellant's Br. p. 11).

[15] When reviewing a claim of prosecutorial misconduct, we first consider whether the prosecutor engaged in misconduct. *Williams v. State*, 724 N.E.2d 1070, 1080 (Ind. 2000). We then consider whether the alleged misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *Id*. The gravity of peril turns on the probable persuasive effect of the misconduct on the jury's verdict, not on the degree of impropriety of the conduct. *Gasper v. State*, 833 N.E.2d 1036, 1042 (Ind. Ct. App. 2005), *trans. denied*. However, to properly preserve an issue regarding the propriety of a closing argument for appeal, a defendant must do more than merely make a prompt objection to the argument. *Id*. "The defendant must also request an admonishment, and if further relief is desired, defendant must move for a mistrial. Failure to request an admonishment results in a waiver of the issue for appellate review." *Flowers v. State*, 738 N.E.2d 1051, 1058 (Ind. 2000).

[16] Before we address Walker's argument, we note that after the State made the challenged closing argument, Walker did not make a contemporaneous objection, nor did he request an admonishment, or a motion for a mistrial. *See Flowers*, 738 N.E.2d at 1058. Nevertheless, Walker attempts to avoid waiver by claiming that the statements made by the State during closing argument amounted to fundamental error. "Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue." *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). "For prosecutorial misconduct to constitute fundamental error, it must make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process [and] present an undeniable and substantial potential for harm.'" *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002) (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). A claim for prosecutorial misconduct presented on appeal in the absence of a contemporaneous trial objection will not succeed unless the defendant establishes not only the grounds for prosecutorial misconduct, but also the additional grounds for fundamental error. *Id*. at 818.

[17] Under the theory of accomplice liability, a person who knowingly or intentionally aids, induces, or causes another person to commit a crime is guilty of committing that crime himself. *See* Ind. Code § 35-41-2-4; *also see*, *Brooks v. State*, 895 N.E.2d 130, 133 (Ind. Ct. App. 2008). To be convicted as an accomplice, there must be affirmative evidence showing the defendant was acting in concert with the principal in the commission of the crime. *Brooks*, 895 N.E.2d at 133-34. Walker argues that the State omitted the knowingly or

intentionally *mens rea* element of accomplice liability in its abbreviated closing argument. We find Walker's argument flawed. Even though the State did not specifically use the terms knowingly or intentionally, it did implicitly include that requirement in what was stated. Specifically, the State argued, in part, "[I]f you are all working together, you are on the hook for every offense that occurs." (Tr. Vol. III, p. 123). The very concept of working together implies that one is aware of what the others are doing and is affirmatively assisting them in a joint endeavor.

[18] Even assuming for argument's sake that the State's closing argument constituted misconduct, the trial court fully instructed the jury on the law of accomplice liability. Walker does not contend that the trial court's instruction was an incomplete or incorrect statement of the law. The instruction refers to the knowing or intentional *mens rea* requirement that Walker claims was missing from the State's closing argument. *See Steinberg v. State*, 941 N.E.2d 515, 531 (Ind. Ct. App. 2011) (holding that trial court's instructions correctly stating the law are presumed to cure any misstatement of the law by a prosecutor in closing argument) *trans. denied*.

[19] Moreover, we find that Walker has not demonstrated that the harm or potential for harm done by the State's statements was undeniable and substantial. *See Booher*, 773 N.E.2d at 817. Any improper inference made by the jury from these statements was inconsequential in light of the overwhelming evidence presented against Walker. *See id*. First, Walker was not placed in grave peril by the State's argument because this was not an accomplice liability case. The

State consistently charged Walker as a principal in all of his five charges. The evidence presented at the trial overwhelmingly proved that Walker hatched the robbery attempt, and three eyewitnesses, including Walker's own girlfriend—Figueiredo consistently testified that Walker shot Thompson. There was also other corroborating evidence, such as the Menards' surveillance video, showing Walker and Figueiredo purchasing zip ties.

[20] Perhaps the most significant fact is that the jury's verdict was much more favorable to Walker than to the State because the jury did not return a verdict on one of the most serious charge against Walker. As noted, the jury was hung on the murder charge, but found Walker guilty of felony murder, attempted robbery, carrying a handgun without a license, and criminal confinement. Indeed, the verdict demonstrates that the jury was not unfairly biased in favor of the State, or unfairly inflamed against Walker by the State's recitation of its theory of accomplice liability. *See Neville v. State*, 976 N.E.2d 1252, 1265 (Ind. Ct. App. 2012) (prosecutor's remarks did not place defendant in grave peril or amount to fundamental error because the evidence against the defendant was strong), *trans. denied*. Thus, we conclude that any resulting error from the State's statement on the theory of accomplice liability, did not make a fair trial impossible or constitute the denial of due process. Walker has not established fundamental error, and we therefore affirm his convictions.

## II. *Inappropriate Sentence*

[21] Walker claims that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) empowers us to independently review and revise sentences authorized by statute if, after due consideration, we find the trial court's decision inappropriate in light of the nature of the offense and the character of the offender. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, while the "character of the offender" permits a broader consideration of the defendant's character. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008); *Douglas v. State*, 878 N.E.2d 873, 881 (Ind. Ct. App. 2007). An appellant bears the burden of showing that both prongs of the inquiry favor a revision of his sentence. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224. Our court focuses on "the length of the aggregate sentence and how it is to be served." *Id*.

[22] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). Here, the trial court entered only judgment of conviction with respect to felony murder, and Class A misdemeanor carrying a handgun without a license. The crime of felony murder is subject to a fixed term of imprisonment "between forty-five (45) and sixty-five (65) years, with the

advisory sentence being fifty-five (55) years." I.C. § 35-50-2-3(a). The trial court sentenced Walker to sixty-three years. Further, a person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one year. I.C. § 35-50-3-2. Here, the trial court sentenced Walker to the maximum sentence of one year.

[23] The nature of Walker's offenses in this case does not support appellate sentence revision. Walker was upset because he believed that Thompson had shorted him in the drug buy. Walker concocted a plan to rob Thompson of his money and drugs, including purchasing zip ties to bind any occupants at Thompson's house at the suggestion of his girlfriend, Figueiredo. Armed with guns, Walker, Keets, and Figueiredo, invaded Thompson's home. When they were unsuccessful in finding any drugs or money, Walker dragged a defenseless Bartlett outside in an apparent attempt to use her as a hostage. While armed with a pool cue stick, Thompson ran outside to rescue Bartlett. At that point, Walker shot twice at Thompson.

[24] The character of the offender is found in what we learn of the offender's life and conduct. *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). Included in the assessment of a defendant's character is a review of his criminal history. *Garcia v. State*, 47 N.E.3d, 1249, 1251 (Ind. Ct. App. 2015). Also, a record of arrests is relevant to a trial court's assessment of the defendant's character. *Cotto v. State*, 829 N.E.2d 520, 526 (Ind. 2005).

[25]    Walker received his first juvenile adjudication at the age of nine, and his juvenile record includes true findings for criminal recklessness, battery (twice), disorderly conduct, criminal mischief, and, most perplexing of all, the attempted murder of his own father when he was fourteen-years old.  In his adult life, Walker has been convicted of possession of a narcotic (multiple), carrying a handgun without a license (multiple), resisting law enforcement (multiple), criminal trespass (multiple), residential entry, operating a vehicle while intoxicated, intimidation, invasion of privacy, and theft (multiple).  Walker has had numerous arrests that have not led to convictions.  In addition, Walker has failed to successfully complete his probation in six of his prior cases, and has violated a placement in community corrections in one case.  The risk-assessment tool within the PSI indicated that Walker was in the "very high" risk category to reoffend.  (Appellant's App. Conf. Vol. II, p. 229).

[26]    Further, we find that Walker's substance abuse also reflects poorly on his character.  Walker began smoking marijuana between the ages of thirteen and fourteen, and would smoke "about seven marijuana blunts daily with his friends."  (Appellant's App. Conf. Vol. II, p. 228).  In 2015, Walker "started using spice" and he admitted to using about "1/2 ounce daily."  (Appellant's App. Conf. Vol. II, p. 228).  Walker's drug abuse, as well as his lengthy criminal history, does not portray Walker in positive light or show substantial virtuous traits or persistent examples of good character to overcome the trial court's judgment.  In light of the foregoing, we decline to find that Walker's

aggregate sentence of sixty-four years is inappropriate in light of the nature of the offenses and his character.

# CONCLUSION

[27] In sum, we conclude that the State did not commit prosecutorial misconduct during closing arguments, and that Walker's sentence is not inappropriate in light of the nature of the offenses and his character.

[28] Affirmed.

[29] May, J. and Mathias, J. concur